Jonathan Zavin (JZ-1846)
Jonathan Neil Strauss (JS-1090)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
-------------------------------------------------------X
RUDINPLAY, INC.,                                      :

                Plaintiff,                      :

        -against-                                  :   Civil Action No.

THE ESTATE OF NELLE HARPER LEE and :  **COMPLAINT**
TONJA B. CARTER,
                              :

            Defendants.                     :
                              :
-------------------------------------------------------X

      Plaintiff Rudinplay, Inc. ("Rudinplay"), by and through its undersigned attorneys,  Loeb & Loeb LLP, as and for its Complaint alleges as follows:

### NATURE OF THE ACTION

      1.      By this action, Rudinplay seeks to protect its rights in, and ensure the public's access to and enjoyment of, an extraordinary creative work—a theatrical adaptation of Harper Lee's acclaimed novel *To Kill a Mockingbird* (the "Novel"), written by the renowned, Academy Award winning writer, Aaron Sorkin.

      2.      Prior to her death, Harper Lee entered into an agreement with Rudinplay (the "Agreement"), whereby she granted Rudinplay an option to acquire worldwide stage rights in the Novel.  Ms. Lee specifically approved Mr. Sorkin to serve as the playwright, and the play is scheduled to premiere, on Broadway, in December, 2018.

3.      Unfortunately, Ms. Lee passed away in February, 2016.  Following Ms. Lee's death, defendant Tonja B. Carter, a lawyer in Ms. Lee's late sister's law firm, has purported to act as the Personal Representative of Ms. Lee's estate.  Even before Ms. Lee's death, Ms. Carter had proven to be a contentious figure, involving Ms. Lee in numerous legal disputes and playing a leading role in the controversial publication of *Go Set a Watchman*—a novel, written by Ms. Lee, that Ms. Carter claimed to discover shortly after Ms. Lee's sister (who had previously handled Ms. Lee's affairs) passed away.

4.      In August, 2017, Rudinplay sent a draft script of the play to Ms. Lee's literary agent in London.  Rudinplay did not receive substantive comments until approximately six months later, when Ms. Carter alleged that the script departed from the spirit of the Novel and altered its characters, ostensibly in violation of the Agreement.  By this time, Rudinplay had already incurred significant expenses in bringing the play to fruition, including casting the play, entering into contracts with the cast members and a general management company, and reserving a theater on Broadway—for the anticipated December, 2018 premiere.

5.      Almost immediately thereafter, in March 2018, Ms. Carter filed a lawsuit against Rudinplay in the United States District Court for the Southern District of Alabama, even though Rudinplay has no contacts with Alabama, and had not dealt directly with anyone in Alabama in negotiating or executing the Agreement.  Rather, Rudinplay had dealt exclusively with Ms. Lee's representatives in New York and London.  Rudinplay has filed a motion to dismiss the Alabama action for lack of personal jurisdiction or, in the alternative, to transfer that action to this Court.

6.      Ms. Carter's conduct, in falsely alleging that the script for the play violates the Agreement, has rendered it impossible for the play to premiere as scheduled in December, 2018, and unless this dispute is resolved in the immediate future, the play will be canceled.  Indeed, upon information and belief, such a result is precisely what Ms. Carter hopes to achieve, as she

wishes for the play to be canceled for ulterior purposes—including to avoid potential liabilities on the part of Ms. Lee's estate resulting from a dispute with third parties concerning ownership of the live stage rights that Ms. Lee had assigned to Rudinplay.

7.      Accordingly, by this action, Rudinplay seeks an expedited determination that the play does not, and will not, violate the Agreement in any way, so that Rudinplay will not be deprived of the valuable rights that it contracted and paid for, and the public will not be deprived of an opportunity to view and enjoy this extraordinary creative work.  Rudinplay also seeks damages resulting from Ms. Carter's breaches of the Agreement, ostensibly on behalf of Ms. Lee's estate, as well as breaches of the covenant of good faith and fair dealing implied in all agreements.

8.      Because the "Play" is defined in the Agreement as the "live stage" adaptation of the Novel, and not merely the script therefore, resolution of Rudinplay's declaratory judgment action will require the Court to view the Play itself, and not simply read the script.  In order to facilitate a speedy resolution, Rudinplay is willing to arrange for an immediate performance of the Play, by its full cast, for the Court's benefit in this Courthouse.  Upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are wholly without merit.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over the defendants because the claims asserted in this Complaint arise out of and relate to defendants' contacts with the State of New York, and defendants purposefully availed themselves of the privilege of conducting activities

within this State, thus invoking the benefits and protections of this State's laws. Among other things, Nelle Harper Lee (the predecessor-in-interest of defendant the Estate of Nelle Harper Lee) entered into an agreement with Rudinplay (a New York corporation), which was negotiated largely in New York by Ms. Lee's representatives in New York, is governed by New York law, and concerns a theatrical production intended to be presented in New York. Defendant Tonja B. Carter has purported to act as the Personal Representative of the Estate of Nelle Harper Lee and is thus bound by its forum-related contacts, and has also individually engaged in extensive forum-related contacts, including participating in meetings in New York and directing communications to New York that are at the heart of the present dispute. The only meeting between Ms. Carter and Scott Rudin, Rudinplay's principal, took place in New York, New York.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

## THE PARTIES

12.     Plaintiff Rudinplay is a New York corporation with its principal place of business in New York, New York. Rudinplay is a theatrical production company, which is wholly-owned by its President, the producer Scott Rudin.

13.     Nelle Harper Lee ("Harper Lee" or "Ms. Lee") was a resident of Monroe County, Alabama until her death on or around February 19, 2016.

14.     Upon information and belief, defendant Tonja B. Carter is a citizen of Monroe County, Alabama. Ms. Carter purports to be the Personal Representative of the Estate of Nelle Harper Lee (the "Estate").

4

## FACTUAL ALLEGATIONS

### Harper Lee and Rudinplay Enter into the Agreement, By Which Rudinplay Acquires an Option to Adapt the Novel into a Live Stage Play

15.     Effective as of June 29, 2015, Rudinplay and Harper Lee entered into an agreement (the "Agreement," a copy of which is annexed as Exhibit A hereto) by which Rudinplay acquired certain rights to adapt the Novel into a live stage play.

16.     The Agreement provided that Rudinplay would have a twelve-month period in which to procure a playwright to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play").  The Agreement provided that the choice of the playwright would be subject to Ms. Lee's written approval, "in her sole and absolutely unfettered discretion."  This absolute approval right over the selection of the playwright for the Play was provided to give Ms. Lee comfort that the writer chosen was of sufficient talent and stature to do justice to her work.

17.     Upon receipt of Ms. Lee's written approval of the playwright, the Agreement provided that Rudinplay would obtain the sole and exclusive option (the "Option") to acquire, on an exclusive (with only a minor exception for stock and amateur rights for an old pre-existing play), worldwide basis, all live stage rights in and to the Novel, and all subsidiary and ancillary rights related to such live stage rights, in consideration for which Rudinplay would pay to Ms. Lee the sum of $100,000.

18.     The Agreement provided that Rudinplay's Option would commence upon payment of the $100,000 and continue for twenty-four (24) months thereafter.  The Agreement further provided that Rudinplay could extend the Option term for an additional twelve (12) months by paying Ms. Lee an additional $50,000, and contained additional terms for further extensions relating to, *inter alia*, the availability of a star, director or theater, and the performances of developmental productions.

19.     The Agreement provides that Rudinplay's Option will be deemed exercised upon the presentation of an initial first class production of the Play on Broadway or the West End of London (the "Initial Production"), within the Option period.  If no such Initial Production is presented within the applicable Option period, Rudinplay's Option will be deemed terminated.

20.     In addition, paragraph 12 of the Agreement also provides that the final Play "shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters." Notably, the Agreement defines the term "Play" as the "live stage play" based on the Novel, and not merely the script therefore.  Thus, it is the live Play itself, not the script, that may not derogate or depart from the spirit of the Novel, or alter its characters.

21.     In sharp contrast to Ms. Lee's absolute approval right over the choice of playwright, the Agreement does not grant her (now, her Estate) any approval right over the script for the Play, or any right to subjectively determine whether the Play "derogates or departs" from the spirit of the Novel, or alters its characters.  Rather, the Agreement provides only that the Estate has "the right to review the script of the Play and to make comments which shall be considered in good faith" by the playwright.  The Agreement further provides that, if the Estate nevertheless believes that the Play does so derogate or depart from the spirit of the Novel, or alter its characters, it must "give[] notice [to Rudinplay] as soon as possible …."  The Agreement further provides that, after receiving such notice, Rudinplay shall "be afforded an opportunity to discuss … resolutions of any such concerns."

22.     The requirement that Ms. Lee (now, the Estate) give immediate notice of any dispute was in recognition of the fact that Rudinplay would incur significant expenses in creating the Play, and, if there was truly a *bona fide* dispute concerning whether the Play adhered sufficiently to the Novel, it should be raised before expenses were incurred unnecessarily.

**Harper Lee Approves Aaron Sorkin as Playwright, and Accepts Payments Totaling $150,000 in Consideration for Rudinplay's Option**

23.     Rudinplay successfully procured Aaron Sorkin, one of the leading theater, film and television writers in America, as the playwright for the Play.  Mr. Sorkin is a winner of the Academy Award, a Golden Globe Award, a Broadcast Film Critics Association Award, the Writers Guild Award, and a BAFTA Award for his screenplay for *The Social Network*.  Mr. Sorkin's other films include *Molly's Game* (for which he received an Academy Award, BAFTA Award and Golden Globes nominations), *Steve Jobs* (for which he won a Golden Globe Award, and received a BAFTA Award nomination), *Moneyball* (for which he received an Academy Award, BAFTA Award and Golden Globes nominations), *The American President* (for which he was nominated for a Golden Globe Award nomination), and the screen adaptation of his play, *A Few Good Men* (for which he received a Golden Globe Award nomination).  In addition to the long-running television series "The West Wing," for which he won four Emmy Awards, a Golden Globe Award, two Humanitas Prizes, and a Writers Guild Award, Mr. Sorkin also created the series "Sports Night" and "Studio 60 on the Sunset Strip," and "The Newsroom." Mr. Sorkin's previous plays include "A Few Good Men" and "The Farnsworth Invention."

24.     Ms. Lee, acting through her London-based literary agent Andrew Nurnberg, and exercising the absolute discretion provided to her under the Agreement, approved Mr. Sorkin as playwright.

25.     The approval of Mr. Sorkin as playwright, among other things, reflected the parties' understanding that the Play, while remaining true to the spirit of the Novel, would not be a mere recitation of the Novel from the stage of the theater.  Mr. Sorkin is one of the leading writers in America with a well-established and unique voice, and his participation as playwright

would hardly be necessary, or appropriate, if the Play were to be a mere transcription of the Novel.

26.     Following Ms. Lee's approval of Mr. Sorkin as playwright, Rudinplay sent a check, payable to Ms. Lee in the amount of $100,000, to Mr. Nurnberg, in London, on November 10, 2015.  Pursuant to paragraph 3(a) of the Agreement, the initial term of the Option commenced upon payment of the $100,000, and continued for twenty-four (24) months thereafter, *i.e.*, until November 10, 2017.

27.     Subsequently, on September 11, 2017, Rudinplay wired an additional $50,000 to Mr. Nurnberg in London, thus extending the Option period for an additional twelve (12) months.

28.     Pursuant to the Agreement, the Option period was subject to further extensions relating to, *inter alia*, the availability of a star, director or theater, and the performances of developmental productions.  The Play is currently scheduled to premiere on Broadway on December 13, 2018, within the Option period, and has a star, a director, and a theater confirmed.

**Following Harper Lee's Death, Ms. Carter Purports to Act as the Personal Representative of the Estate**

29.     Harper Lee passed away on February 19, 2016.  Following Ms. Lee's death, defendant Tonja B. Carter has acted as the Personal Representative of Ms. Lee's Estate.

30.     Ms. Carter, an attorney in the law firm formerly run by Harper Lee's older sister, Alice Lee, had proven to be a controversial figure even before Harper Lee's death.  Alice Lee passed away in November, 2014.  Three months later, it was announced that Ms. Carter had discovered Harper Lee's unpublished manuscript *Go Set a Watchman*.  The controversy surrounding the publication of *Go Set a Watchman*, and Ms. Carter's ostensible role in discovering it, has been well documented:

> • "The announcement of the rediscovered 'Watchman' manuscript touched off a debate over Harper Lee's capacity to consent to its publication….  Exactly

when and how Ms. Carter discovered the manuscript remains unclear." Jennifer Maloney and Laura Stevens, *Harper's Lee's Lawyer Expands Role; Tonja Carter is locked in a conflict between Ms. Lee and a museum that fosters her legacy*, WALL STREET JOURNAL, July 9, 2015.

- "The controversy surrounding 'Watchman' divided Ms. Lee's hometown, pitting some of her longtime friends and acquaintances, who doubted she had approved of the publication, against Ms. Lee's lawyer, agent and publisher, generating the kind of public spectacle Ms. Lee abhorred…. Ms. Carter emerged as a polarizing figure in the debate. She was at first credited with recovering Ms. Lee's long lost novel, and recounted how she discovered the manuscript for 'Watchman' in a safe deposit box in the summer of 2014. But others disputed that account and said Ms. Carter had been present when the manuscript was discovered in October 2011 during an appraisal by a rare books expert." Serge F. Kovaleski and Alexandra Alter, *Harper Lee's Will, Unsealed, Only Adds More Mystery to Her Life*, THE N.Y. TIMES, March 2, 2018.

- "Controversy has raged since it emerged last month that Lee's lawyer, local attorney Tonja Carter, declared that she had stumbled upon an unpublished manuscript of the novelist's that was a forerunner to Mockingbird and, with the author's agreement, it will be published as a book this summer by HarperCollins. The announcement of Lee's new book earlier this year immediately sparked questions about whether she had given fully informed consent to the publication and was capable of making an independent decision about it …." Joanna Walters, *Harper Lee subject of elder abuse investigation in Alabama, Officials interviewed the 88-year old author of To Kill a Mockingbird in February, before talking to an old friend and neighbor, about her welfare,* THE GUARDIAN, March 12, 2015.

- "The manuscript was presumed lost, according to reports, but was controversially found in 2014 in a safety deposit box by her lawyer, Tonja B. Carter, alongside the original Mockingbird manuscript…. Some friends said that after the death of Alice, a lawyer who handled Lee's affairs, Carter had manipulated Lee to approve publication." Joel Christie, *To Kill a Mockingbird author Harper Lee passes away peacefully at the age of 89*, MAILONLINE, February 19, 2016.

- "Harper Lee's lawyer, who negotiated the deal over this week's controversial launch of Go Set a Watchman, was allegedly far more intricately involved in searching for the manuscript years ago than previously disclosed, the Guardian has been told. According to the allegations, Tonja Carter instigated a meeting at least four years ago in which the author's personal safe deposit box was opened and its contents itemized. The new account appears to conflict with Carter's own version of events, in which the lawyer insisted the manuscript for Lee's second novel was only found in that same deposit box last August." Ed Pilkington, *The lawyer, the lock box and the lost novel: Harper Lee book mystery widens; New account from literary agent appears to*

*conflict with lawyer Tonja Carter's version of the events that led to the discovery of Go Set a Watchman manuscript*, THE GUARDIAN, July 15, 2015.

31.     Among other things, the publication of *Go Set a Watchman* was controversial due to its depiction of Atticus Finch, *To Kill a Mockingbird*'s noble, heroic attorney, as a racist and member of the White Citizens Council (part of a network of white supremacist organizations in the Southern United States in the 1950s, founded primarily to oppose racial integration of schools).

32.     Ms. Carter has been the subject of other controversies as well.  In 2014, the author Marja Mills, who had moved next door to Harper Lee and her sister Alice Lee in 2004, published her book "The Mockingbird Next Door:  Life with Harper Lee."  Ms. Lee issued a statement, through Ms. Carter, saying that the book was not authorized.  In response, Ms. Mills produced a handwritten apology letter from Alice Lee who said Ms. Carter had created the statement and had Ms. Lee sign it.

33.     Ms. Carter was also involved in a controversial decisions on the part of Ms. Lee to sue a local museum in Monroeville that had sold *To Kill a Mockingbird*-related items, and to seize control of a local stage production of *To Kill a Mockingbird* that had previously been performed in a local courthouse.

34.     After Ms. Lee's death, Ms. Carter, purporting to act in her capacity as the person named as the Personal Representative in Ms. Lee's will (the "Will") moved the Probate Court of Monroe County, Alabama to seal Ms. Lee's probate proceeding.  Ms. Lee's probate file, including her Will, was sealed immediately upon the filing of Ms. Carter's motion on February 29, 2016, and remained sealed until February 27, 2018 when, following litigation with The New York Times Company concerning the propriety of the sealing order, the sealing order was vacated.

35.     Following the lifting of the sealing order, the Will (a copy of which is annexed as Exhibit B hereto) became publicly available for the first time.  The Will is dated February 11, 2016, just eight days before Ms. Lee's death.

36.     The Will directs that the bulk of Ms. Lee's assets, including her literary properties, be transferred to a trust, the "2011 Mockingbird Trust."  The Will also purports to appoint Carter as "personal representative," and states that the "personal representative" "may rely and take action upon the advice of the Literary Agent, if one exists, of the 2011 Mockingbird Trust," with respect to the Estate's literary properties.

37.     The will does not disclose the identity of the "Literary Agent" upon whom Carter is instructed to rely, although the literary agent with whom Rudinplay has been dealing on behalf of the Estate, from the inception of the negotiation of the contract to the present, is Andrew Nurnberg, in London, UK.

38.     The 2011 Mockingbird Trust documents have not been publicly disclosed, nor have the beneficiaries of the Trust.

**The Estate Receives a Copy of the Play in August 2017, But Does Not Assert its Purported Objections Until Approximately Six Months Later**

39.     Throughout 2016 and 2017, Mr. Sorkin drafted the script for the Play.  On August 24, 2017, Mr. Rudin sent a draft of the script to Mr. Nurnberg, Ms. Lee's literary agent in London with whom Mr. Rudin and his representatives had dealt extensively in negotiating and executing the Agreement.

40.     On or around September 25, 2017, Mr. Rudin had a brief telephone conversation with Ms. Carter, during which Ms. Carter made a minor comment concerning the script regarding what she perceived to be "passive aggression" between the characters of Atticus and Calpurnia.

41.     Following his conversation with Ms. Carter, on September 28, 2017, Mr. Rudin received an email from Mr. Nurnberg, in which Mr. Nurnberg stated that "I had Tonja [Carter] on the phone, and she was really delighted by her conversation with you.  We are all agreed that the Atticus in the play must remain the Atticus of the book."

42.     In his September 28, 2017 email, Mr. Nurnberg also conveyed that the Atticus of the Play must remain true to the younger Atticus of *To Kill a Mockingbird*, and not progress to the older Atticus of *Go Set a Watchman*.  Beyond that Mr. Nurnberg offered no substantive comments.

43.     On September 29, 2017, Mr. Rudin wrote back to Mr. Nurnberg.  In his email, Mr. Rudin observed that while there would necessarily be some differences between the Play and the Novel owing to the different mediums, the Play would certainly remain true to the Novel's ethos, or spirit:

> We're not looking to make any wholesale changes from what Nelle did but simply to dramatize the book, which is sometimes very passive and more ruminative than dramatic.  We must always have forward motion happening in the narrative, and while some of that might be slightly different than the book, it is not ever intended to change anything about the ethos of the book.  We may want to draw events or relationships slightly differently than Nelle did because we have to have drama occurring (whereas the book does not), and because it is conflict that makes for drama—but I do not think any of what we're doing would ever make anybody who loves the book feel remotely like they were not getting the book onstage.

44.     Following these communications, Rudinplay continued to incur expenses in preparation for the Play's premiere.  Among other things, Rudinplay has reserved a theater on Broadway, for a December, 2018 premiere; has cast the Play (with the esteemed actor Jeff Daniels set to play Atticus Finch) and has entered into contracts with cast members; has retained a director, Bartlett Sher, the resident director of Lincoln Center Theater (and a Tony Award

winner, and seven-time nominee); has scheduled numerous workshops, and has contracted with a general management company for the production.

45.     On or around February 13, 2018, Mr. Rudin sent an updated draft script to Mr. Nurnberg and Ms. Carter, which contained some revisions (including to address the minor comments raised by Ms. Carter during the September 2017 telephone conversation), but was, in all material respects, substantively similar to the version that Mr. Rudin had previously sent on August 24, 2017.  As with the earlier draft, the character of Atticus in the draft script remained noble and idealistic, and true to the character as he appeared in *To Kill a Mockingbird*, and did not in any way progress to or resemble the older, racist Atticus of *Go Set a Watchman*.

46.     On February 16, 2018, Mr. Rudin met with Ms. Carter and Mr. Nurnberg in New York, New York (the only in-person meeting between Mr. Rudin and Ms. Carter).  During that meeting, Ms. Carter raised purported "objections" to the Play that neither she nor Mr. Nurnberg had ever previously asserted.

47.     On March 5, 2017—over six and a half months after receiving a substantially complete draft of the Play's script—Ms. Carter sent a letter to Mr. Rudin (the "March 5 Letter") in which she purported to raise, for the first time, a litany of additional objections to the script.

48.     Among other things, the March 5 Letter asserted that the script for the Play "altered" the characters of Atticus Finch, Calpurnia, Tom Robinson, Jem Finch and Scout Finch, and somehow "derogated or departed" from the spirit of the Novel in several ways.

49.     In ostensible support of these claims, Ms. Carter purported to critique and comment on numerous individual lines of dialogue and minor plot points.  For example, in support of her claim that the Novel "altered" the character of Atticus Finch, Carter asserted, *inter alia*, that "Atticus would never have used a fancy legal term like 'ex parte communication' in talking to Bob Ewell;" "Atticus would not have said that it would be witness tampering to talk to

a witness in a criminal case;" and "Atticus would not have used throwaway lines like, 'You guys have no shortage of catchy slogans,' and 'Then you'll be my man if I ever set out to sea.'"

50.     The Agreement did not give Ms. Lee approval rights over the script of the Play, much less did it give her a right to purport to edit individual lines of dialogue.  It certainly did not give such rights to Ms. Carter, who is not an author, editor, literary agent or critic, and has no known expertise whatsoever in theater or writing.

51.     Upon information and belief, in her dealings with Rudinplay, including in sending the March 5 Letter, Ms. Carter has not been relying upon or taking action in accordance with the advice of the Literary Agent of the 2011 Mockingbird Trust, as required by Ms. Lee's Will.  Nor does Rudinplay have any information that Ms. Carter has consulted with the beneficiaries of the trust who would benefit from the production of the Play.

52.     Rudinplay's attorney responded to the March 5 Letter on March 9, 2018 (the "March 9 Letter").  Among other things, in his response, Rudinplay's attorney noted that Rudinplay did not believe that the then-current draft of the script of the Play either derogated or departed from the spirit of the Novel or altered its characters, but that Rudinplay was "eager to discuss the issues raised … and to have a dialogue about these issues"—as Rudinplay was entitled under the Agreement.

53.     The March 9 Letter also observed that there was limited time to make changes to the script, as the final workshops for the Play were fast approaching, a director had already been retained, a theater had been reserved for the Play to open in December 2018, and the Play had been cast and the company contracted.  The letter also noted that the limited time to make changes to the script had been exacerbated by the fact that virtually the same script had been sent to the Estate more than six months prior, and the Estate and its representatives had previously offered far more modest and limited comments.

**The Estate Refuses to Meet with Rudinplay to Resolve the Purported Dispute, and Instead Files Suit Against Rudinplay in Alabama Federal Court**

54.     Ms. Carter did not respond to the March 9 Letter, or agree to meet with Rudinplay to discuss resolution of the Estate's purported concerns (as the Estate is required to do under the Agreement).

55.     Instead, just four days later, on March 13, 2018, Ms. Carter, purportedly acting in her capacity as Personal Representative of the Estate, filed a Complaint against Rudinplay (the "Initial Complaint") in the United States District Court for the Southern District of Alabama (the "Alabama Action").

56.     In its Initial Complaint in the Alabama Action, the Estate sought a declaration that the Play violates the Agreement because it purportedly:  (i) derogates or departs from the spirit of the Novel in connection with its depiction of the legal proceedings against Tom Robinson; (ii) derogates or departs from the spirit of the Novel in connection with its depiction of a small Alabama town in the 1930s; (iii) derogates or departs from the spirit of the Novel in connection with other matters identified in the March 5 Letter; (iv) alters the character of Atticus Finch; (v) alters the character of Calpurnia; (vi) alters the character of Tom Robinson; (vii) alters the character of Jem Finch; and (viii) alters the character of Scout Finch.

57.     Just a few weeks later, on April 6, 2018, Carter filed an amended complaint in the Alabama Action (the "Amended Alabama Complaint"), which withdraws numerous of the Initial Complaint's claimed bases for declaratory relief.  The Amended Alabama Complaint seeks a declaration that the Play violates the Agreement because it purportedly (i) derogates or departs from the spirit of the Novel in connection with its depiction of the legal proceedings against Tom Robinson, and (ii) alters the characters of Atticus Finch and Jem Finch.

58.     The Estate has apparently abandoned Ms. Carter's previously asserted claims that the Play derogates or departs from the spirit of the Novel in any other respect, or alters any characters other than Atticus and Jem.

59.     On April 9, 2018, the next business day after receiving the Amended Alabama Complaint, Rudinplay moved to dismiss the Alabama Action for lack of personal jurisdiction over Rudinplay pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404.

60.     As explained in greater detail in Rudinplay's motion to dismiss the Alabama Action, there is no basis for the assertion of personal jurisdiction over Rudinplay in Alabama, and the law is clear that the mere act of entering into a contract with an Alabama resident is not sufficient to subject a defendant to personal jurisdiction in that forum.  Rudinplay has no contacts with Alabama, did not set foot in Alabama or deal directly with anyone in Alabama in negotiating or executing the Agreement at issue, and did not take any action by which it purposefully availed itself of the privilege of conducting activities within Alabama.  To the contrary, in negotiating and executing the Agreement, Rudinplay dealt exclusively with Ms. Lee's representatives in New York and London, the Agreement is governed by New York (not Alabama) law, and the performance of the Agreement has occurred almost entirely in New York.

**Carter's False and Improperly-Motivated Claims Are Preventing Rudinplay from Exercising its Option, and Are Causing Irreparable Harm**

61.     Rudinplay's motion to dismiss the Alabama Action has not yet been decided. However, Rudinplay is compelled to immediately file this action because it is suffering, and will continue to suffer, irreparable harm in the absence of expedited discovery and an expedited determination of its declaratory judgment claims.

62.     Pursuant to the Agreement, in order to exercise its Option to acquire live stage rights in and to the Novel, Rudinplay must present the Initial Production of the Play, either on Broadway or in the West End of London, within a specified time frame.

63.     In order for the Play to premiere as scheduled in December 2018, Rudinplay will need to raise millions of dollars in additional capitalization.  However, the existence of the present dispute has rendered it impossible to raise the necessary capitalization, as investors are not willing to invest millions of dollars when a cloud exists over Rudinplay's rights.

64.     If the present dispute is not resolved in the immediate future, Rudinplay will not be able to raise the necessary capitalization, the cast will be released from its commitments, and the reservation of the theater and the Initial Production will be canceled.

65.     Upon information and belief, Ms. Carter's purported objections to the Play's script of the Play are a pretense, designed to force cancellation of the Play and to cause Rudinplay's Option to expire before it can be exercised.

66.     Upon information and belief, among other reasons, Ms. Carter seeks to compel the cancellation of the Play because the Estate has been involved in a dispute with a third party or parties (the heirs of or the Estate of Gregory Peck), concerning ownership of the live stage rights that Ms. Lee assigned to Rudinplay pursuant to the Agreement.  Ms. Carter wishes the Play to be canceled so that the Estate may avoid potential liability to such third party or parties, and/or potential indemnification obligations to Rudinplay.

67.     Rudinplay will suffer irreparable harm if it is prevented from exercising its Option to acquire the live stage rights in and to the Novel by staging the Initial Production.  In addition to the immeasurable damage to Rudinplay's reputation in the theater community that will result from cancellation of the Play, monetary damages resulting from this lost opportunity will be difficult, if not impossible, to quantify.

68.     The Agreement requires that the live stage Play itself (and not the script therefore) may not derogate or depart from the spirit of the Novel or alter its characters.  Accordingly, determination of whether or not the Play impermissibly departs or derogates from the spirit of the Novel, or alters its characters, will require the Court to actually view the Play, rather than merely read its script.  Among other things, determining whether the character of Atticus appearing in the Play is true to the Atticus of the Novel will require the Court to observe Jeff Daniels' portrayal of this iconic character.

69.     In order to facilitate expedited resolution of its declaratory judgment claims, Rudinplay is willing to arrange for an immediate performance of the Play, by as much of its full Broadway cast as is possible, for the Court's benefit in this Courthouse.  Upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are without merit.

### AS AND FOR A FIRST CAUSE OF ACTION
Declaratory Judgment – The Play Does Not Derogate or Depart from the
Spirit of the Novel, or Alter its Characters (Against the Estate)

70.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 69 of the Complaint as if fully stated herein.

71.     Paragraph 12 of the Agreement provides, *inter alia*, that the Play shall not derogate or depart in any manner from the spirit of the Novel or alter its characters.

72.     Ms. Carter, purporting to act on behalf of the Estate, has commenced the Alabama Action, seeking a declaration that the Play derogates or departs from the spirit of the Novel and alters characters.

73.     Ms. Carter's allegations have resulted in irreparable harm to Rudinplay.

74.     By reason of the foregoing, there presently exists a real and actual controversy concerning whether the Play derogates or departs from the spirit of the Novel or alters its

characters in violation of the Agreement, and Rudinplay seeks and is entitled to a declaration that the Play does not so derogate or depart from the spirit of the Novel or impermissibly alter its characters.

75.     In order to avoid further irreparable injury, Rudinplay is entitled to expedited discovery and expedited resolution of its claim for declaratory judgment pursuant to Rules 42(b) and 57 of the Federal Rules of Civil Procedure.

### AS AND FOR A SECOND CAUSE OF ACTION

Declaratory Judgment – Ms. Carter Lacks Authority to Assert Purported Objections
to the Play on Behalf of the Estate (Against Ms. Carter and the Estate)

76.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 75 of the Complaint as if fully stated herein.

77.     Ms. Lee's Will, which purported to appoint Ms. Carter as "personal representative," is dated February 11, 2016, just eight days before Ms. Lee's death.

78.     Upon information and belief, the purported appointment of Ms. Carter as personal representative of the Will is invalid and ineffective.

79.     The Will directs that Ms. Carter rely and take action upon the advice of the Literary Agent of the 2011 Mockingbird Trust with respect to the Estate's literary properties.

80.     Upon information and belief, Ms. Carter has not been relying or taking action upon the advice of the Literary Agent of the 2011 Mockingbird Trust in connection with its dealings with Rudinplay.

81.     The 2011 Mockingbird Trust documents have not been publicly disclosed. Rudinplay does not have any information that indicates that Ms. Carter has consulted with Trustees of the Trust, or the beneficiaries of the Trust who would benefit from the production of the Play, regarding the commencement or continuation of the Alabama Action.

82.     Ms. Carter, purporting to act on behalf of the Estate, has commenced the Alabama Action, seeking a declaration that the Play derogates or departs from the spirit of the Novel and alters characters.

83.     Ms. Carter's allegations have resulted in irreparable harm to Rudinplay.

84.     By reason of the foregoing, there presently exists a real and actual controversy concerning whether Ms. Carter has authority to assert purported objections to the Play on behalf of the Estate, and Rudinplay seeks and is entitled to a declaration that Ms. Carter lacks such authority.

85.     In order to avoid further irreparable injury, Rudinplay is entitled to expedited discovery (including but not limited to expedited discovery concerning the 2011 Mockingbird Trust documents, the identity of the Literary Agent of the 2011 Mockingbird Trust, and the circumstances behind the execution of Ms. Lee's Will) and expedited resolution of its claim for declaratory judgment pursuant to Rules 42(b) and 57 of the Federal Rules of Civil Procedure.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
Breach of Contract Against the Estate

86.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 85 of the Complaint as if fully stated herein.

87.     Paragraph 12 of the Agreement requires that, if Ms. Lee (now, her Estate) believes that the Play derogates or departs from the spirit of the Novel, or alters its characters, the Estate must notify Rudinplay as soon as possible, and must afford Rudinplay an opportunity to discuss resolution of any purported concerns.

88.     The Estate has breached these provisions by, *inter alia*, waiting approximately six months after receiving a substantially complete draft of the Play's script to identify its purported objections (during which time Rudinplay continued to incur significant expenses in connection

with the Play's creation), and then failing and refusing to discuss resolution of its purported concerns with Rudinplay prior to commencing the Alabama Action.

89.     As a result of the foregoing Rudinplay has been damaged in an amount to be proved at trial, but in no event less than $10 million, as well as interest thereon.

## AS AND FOR A FOURTH CAUSE OF ACTION
Breach of Contract Against the Estate for Breach of the Covenant of Good Faith and Fair Dealing

90.     Rudinplay repeats and realleges each of the allegations made in paragraphs 1 through 89 of the Complaint as if fully stated herein.

91.     By its conduct, and without any basis for, and for impermissible reasons, the Estate is preventing Rudinplay from exercising its Option and staging the Initial Production.

92.     By its conduct, and without any basis for, and for impermissible reasons, the Estate is preventing Rudinplay from receiving the benefits that it contracted and paid for pursuant to the parties' Agreement.

93.     As a result of the foregoing, Rudinplay has been damaged in an amount to be proved at trial, but in no event less than $10 million, as well as interest thereon.

## DEMAND FOR JURY TRIAL

Rudinplay hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Rudinplay requests that this Court enter judgment in its favor and against Ms. Carter and the Estate as follows:

A.     Declaring that the Play does not derogate or depart from the spirit of the Novel or alter its characters in a manner that violates the Agreement;

B.     Declaring that Ms. Carter lacks authority to purport to act on behalf of the Estate in alleging that the Play so derogates or departs, or alters characters;

21

C.      Ordering that the parties' engage in expedited discovery in connection with Rudinplay's declaratory judgment claims, and that resolution of such claims be scheduled for expedited determination in accordance with Rules 42(b) and 57 of the Federal Rules of Civil Procedure;

D.      Awarding Rudinplay damages on its breach of contract and breach of the covenant of good faith and fair dealing claims, in an amount to be proved at trial but in no event less than $10 million, together with interest thereon;

E.      Awarding Rudinplay its costs and attorneys' fees; and

F.      Granting Rudinplay such other and further relief as the Court shall deem just and proper.

Dated:  New York, New York
        April 16, 2018

LOEB & LOEB LLP

By: ___/s Jonathan Strauss_____
        Jonathan Zavin (JZ-1846)
        Jonathan Neil Strauss (JS-1090)
        345 Park Avenue
        New York, New York 10154-1895
        (212) 407-4000

        *Attorneys for Plaintiff*