**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

RUDINPLAY, INC.,               :

        Plaintiff,        :    No. 1:18-cv-03300

      -against-        :    Hon. Analisa Torres

TONJA B. CARTER and THE ESTATE OF  :
NELLE HARPER LEE,

                      :

        Defendants.

                      :

---------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY, EXPEDITED RESOLUTION OF DECLARATORY JUDGMENT CLAIMS, AND A SEALING ORDER

LOEB & LOEB LLP
Jonathan Zavin
Jonathan Neil Strauss
Sarah Schacter
Sara A. Slavin
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS RELEVANT TO THE MOTION ....................................... 4

    A.    Rudinplay Acquires an Option to Adapt To Kill a Mockingbird into a
            Live Stage Play, and Incurs Significant Expenses Preparing the Play for
            its Broadway Premiere ........................................................................................... 4

    B.    Following Harper Lee's Death, Ms. Carter Purports to Act as the
            Personal Representative of Ms. Lee's Estate ..................................................... 5

    C.    Following Harper Lee's Death, Ms. Carter Claims that the Play Departs
            from the "Spirit" of the Novel, and Files Suit Against Rudinplay in
            Alabama Federal Court ...................................................................................... 6

    D.    Defendants' False Claims are Preventing Rudinplay from Exercising its
            Option, and Are Causing Irreparable Harm .................................................... 9

ARGUMENT ................................................................................................................... 10

I.      RUDINPLAY SHOULD RECEIVE EXPEDITED DISCOVERY ................... 10

II.    RUDINPLAY'S DECLARATORY JUDGMENT CLAIMS SHOULD
        RECEIVE AN EXPEDITED RESOLUTION ................................................... 13

III.   CONFIDENTIAL INFORMATION CONCERNING THE PLAY, AN
        UNPUBLISHED WORK, SHOULD BE FILED UNDER SEAL .................... 15

CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayyash v. Bank Al-Madina,*
233 F.R.D. 325 (S.D.N.Y. 2005) (Lynch, J.) ..................................................... 10-11

*Benham Jewelry Corp. v. Aron Basha Corp.,*
No. 97 Civ. 3841 (RWS), 1997 U.S. Dist. LEXIS 15957 (S.D.N.Y. Oct. 14,
1997) .......................................................................................................................10

*Carter v. City of New York,*
14-CV-4236 (VEC), 2016 U.S. Dist. LEXIS 75783 (S.D.N.Y. June 9, 2016)..................17, 18

*Chevron Corp. v. Donziger,*
800 F. Supp. 2d 484 (S.D.N.Y. 2011)...................................................................14

*Harper & Row, Publrs. v. Nation Enters.,*
471 U.S. 539 (1985)................................................................................................16, 18

*Lugosch v. Pyramid Co. of Onondaga,*
435 F.3d 110 (2d Cir. 2006).....................................................................................17

*OMG Fid., Inc. v. Sirius Techs., Inc.,*
239 F.R.D. 300 (N.D.N.Y. 2006) ............................................................................11

*Raza v. City of New York,*
998 F. Supp. 2d 70 (E.D.N.Y. 2013) ......................................................................11

*Rechler P'ship v. Resolution Tr. Corp.,*
Civil No. 90-3091, 1990 U.S. Dist. LEXIS 18714 (D.N.J. Sep. 4, 1990) ...............14

*Stern v. Crosby,*
246 F.R.D. 453 (S.D.N.Y. 2007) ............................................................................11

*United States v. Amodeo,*
71 F.3d 1044 (2d Cir. 1995)....................................................................................17

**Rules**

Fed. R. Civ. Pro. 42................................................................................................13

Fed. R. Civ. Pro. 57................................................................................................2, 13, 14

**Other Authorities**

10B Charles Alan Wright et al., Fed. Prac. & Proc.: Civ. 4th § 2768, at 646-47
(2016)..........................................................................................................................14

Plaintiff Rudinplay, Inc. ("Rudinplay"), by and through its undersigned attorneys, Loeb & Loeb LLP, respectfully submits this memorandum of law in support of its motion, brought by order to show cause, for orders (i) granting expedited discovery pursuant to Federal Rules of Civil Procedure 26 and 27, (ii) scheduling an expedited trial of Rudinplay's declaratory judgment claims pursuant to Federal Rules of Civil Procedure 42(b) and 57, and (iii) requiring that certain confidential information be filed under seal.

## PRELIMINARY STATEMENT

By this action and motion, Rudinplay seeks to protect its rights in, and ensure the public's access to and enjoyment of, an extraordinary creative work—a theatrical adaptation of Harper Lee's acclaimed novel *To Kill a Mockingbird* (the "Novel"), written by the renowned, Academy Award winning writer Aaron Sorkin.

Prior to her death, Harper Lee entered into an agreement with Rudinplay (the "Agreement") whereby she granted Rudinplay an option to acquire worldwide stage rights in the Novel. Ms. Lee specifically approved Mr. Sorkin to serve as the playwright, and the play is scheduled to premiere on Broadway in December, 2018. Rudinplay has incurred significant expenses in bringing the play to fruition, including retaining a Tony Award winning director, casting the play (including casting the esteemed actor Jeff Daniels to portray Atticus Finch), entering into numerous contracts in preparation for the Play's premiere, and reserving a theater.

Unfortunately, Ms. Lee passed away in February, 2016. Following her death, defendant Tonja B. Carter has purported to act as the Personal Representative of Ms. Lee's Estate. In that capacity, Ms. Lee has sought to prevent Rudinplay from ever exercising the option that it contracted and paid for. Specifically, on March 5, 2018—almost six months after first receiving a draft of a script for the play—Ms. Carter (falsely) asserted that the script departed from the spirit of the Novel and altered its characters, ostensibly in violation of the Agreement. Almost

immediately thereafter, Ms. Carter filed a lawsuit against Rudinplay in the United States District Court for the Southern District of Alabama. In her improper rush to the Courthouse, Ms. Carter breached the Agreement, which requires that Rudinplay be given an opportunity to discuss a resolution of her purported concerns before a lawsuit may be brought. Moreover, Rudinplay has no contacts with Alabama, and never dealt directly with anyone in Alabama in negotiating or executing the Agreement; to the contrary, Rudinplay dealt exclusively with Ms. Lee's representatives in New York and London. Rudinplay has filed a motion to dismiss the Alabama action for lack of personal jurisdiction or, in the alternative, to transfer that action to this Court.

Rudinplay's motion to dismiss the Alabama action has not yet been decided. However, Rudinplay has been compelled to immediately file this action because it will suffer irreparable harm in the absence of expedited discovery and an expedited determination of its declaratory judgment claims. Pursuant to the Agreement, in order to exercise its option to acquire live stage rights in and to the Novel, Rudinplay must premiere the play, either on Broadway or in the West End of London, within a specified time frame. In order for the play to premiere as scheduled in December 2018, Rudinplay will need to raise millions of dollars in additional capitalization. However, the existence of the present dispute has rendered it impossible to raise the necessary capitalization, as reliable investors are not willing to invest millions of dollars when a cloud exists over Rudinplay's rights. If the present dispute is not resolved in the very immediate future, Rudinplay will not be able to raise the necessary capitalization, the cast will be released from its commitments, and the reservation of the theater, and the play, will be canceled.

In these circumstances, Rudinplay is plainly entitled to expedited discovery, and expedited resolution of its declaratory judgment claims. The law is clear that "[t]he court may order a speedy hearing of a declaratory judgment action." Fed. R. Civ. Pro. 57. Here, Rudinplay

seeks two forms of declaratory relief: (i) a declaration that the play does not impermissibly derogate or depart from the spirit of the Novel, or alter its characters, in violation of the Agreement, and (ii) a declaration that Ms. Carter lacks authority to assert her purported "objections" to the play on behalf of Ms. Lee's estate. Speedy disposition of either of these claims in Rudinplay's favor would avoid the irreparable harm that would otherwise befall Rudinplay (and the public, which would be deprived of the opportunity to enjoy an extraordinary creative work). By contrast, expedited resolution of Rudinplay's declaratory judgment claims would not prejudice Defendants in any way. Further, the expedited discovery that Rudinplay seeks is limited, and narrowly tailored to the issues that are at the heart of, and may lead to a speedy resolution of, the present dispute.

Conversely, if expedited proceedings are not granted, even if the Court subsequently rules in Rudinplay's favor, it will be too little, too late. The Play will already have been canceled, Rudinplay will have lost the opportunity that it contracted and paid for, and the public will have been deprived of the opportunity to view this artistic work.

It should be noted that, because the "Play" is defined in the Agreement as the "live stage" adaptation of the Novel, and not merely the script therefore, resolution of Rudinplay's declaratory judgment action will require the Court (and the jury) to view the Play itself, and not simply read the script. In order to facilitate a speedy resolution, Rudinplay is willing to arrange for an immediate performance of the Play, by as much of its full Broadway cast as possible, to take place in the Courthouse, for the Court's (and the jury's) benefit. Upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are wholly without merit.

## STATEMENT OF FACTS RELEVANT TO THE MOTION

### A. Rudinplay Acquires an Option to Adapt *To Kill a Mockingbird* into a Live Stage Play, and Incurs Significant Expenses Preparing the Play for its Broadway Premiere

Effective as of June 29, 2015, Rudinplay and the author Harper Lee entered into an agreement (the "Agreement," Rudin Decl. Ex. A),[1] by which Rudinplay acquired certain rights to adapt Ms. Lee's acclaimed novel *To Kill a Mockingbird* (the "Novel") into a live stage play. (*See* Rudin Decl. ¶ 2).

The Agreement provided that Rudinplay would have a twelve-month period in which to procure a playwright to create a dramatic adaptation of the Novel for presentation of a live stage play (the "Play"), with the choice of the playwright subject to Ms. Lee's written approval, in her absolute discretion. (Agreement ¶¶ 1, 12). Prior to Ms. Lee's passing, Rudinplay successfully procured Aaron Sorkin, one of the leading theater, film and television writers in America, as the playwright for the Play, and Ms. Lee approved the selection of Mr. Sorkin as playwright in accordance with the Agreement. (Rudin Decl. ¶ 3).

The Agreement also provided that, upon having obtained Ms. Lee's approval of the playwright (and paying to Ms. Lee the sum of $100,000), Rudinplay would receive an option (the "Option") to acquire certain live stage rights in and to the Novel, that the initial term of the Option would be twenty-four (24) months, that Rudinplay could extend the Option period by an additional twelve (12) months by paying an additional $50,000, and that the Option was subject to further extensions relating to, among other things, the availability of a star, director or theater, and the performances of developmental productions. (Agreement ¶¶ 2(a), 3). In accordance with these provisions, Rudinplay paid Ms. Lee (through her London-based literary agent,

---

[1] References to "Rudin Decl." are to the Declaration of Scott Rudin dated April 17, 2018, submitted herewith.

Andrew Nurnberg), the sums of $100,000 on November 10, 2015, and $50,000 on September 11, 2017, in order to procure, and extend, its Option. (Rudin Decl. ¶ 4).

The Agreement further provides that, in order to exercise its Option, Rudinplay must present an initial commercial first class production of the Play, either on Broadway or in the West End of London, within the applicable Option period. (Agreement ¶ 4). To this end, Rudinplay has incurred significant expenses preparing the Play for an initial, first class production on Broadway. Among other things, in addition to retaining Mr. Sorkin as playwright, Rudinplay has retained a director (Bartlett Sher, the resident director of Lincoln Center Theater, a Tony Award winner and a seven-time Tony nominee), has cast the play (including engaging the acclaimed actor Jeff Daniels to portray Atticus Finch) and entered into contracts with cast members, has scheduled and funded numerous developmental workshops, has contracted with a general management company for the production, and has reserved a theater for the Play's anticipated Broadway premiere. (Rudin Decl. ¶ 7).

The Play is currently scheduled to premiere, on Broadway, in December 2018. (*Id.*).

## B. Following Harper Lee's Death, Ms. Carter Purports to Act as the Personal Representative of Ms. Lee's Estate

Ms. Lee passed away on or about February 19, 2016. Following Ms. Lee's death, defendant Tonja B. Carter has purported to act as the Personal Representative of Ms. Lee's Estate. (Strauss Decl. Ex. I, ¶¶ 1-2).[2]

After Ms. Lee's death, Ms. Carter moved the Probate Court of Monroe County, Alabama to seal Ms. Lee's probate proceeding. Ms. Lee's probate file, including her will (the "Will"), remained sealed for approximately two years until February 27, 2018 when, following litigation

---

[2] References to "Strauss Decl." are to the Declaration of Jonathan Strauss dated April 17, 2018, submitted herewith.

5

between the Estate and the New York Times Company concerning the propriety of the sealing order, the sealing order was vacated. (Strauss Decl. ¶¶ 2-3).[3]

Following the lifting of the sealing order, Ms. Lee's Will became publicly available for the first time. The unsealing revealed that the Will is dated February 11, 2016—just eight days before Ms. Lee's death. (Strauss Decl. Ex. G, Will at 1). The Will purports to appoint Carter as "personal representative" and states that the "personal representative" "may rely and take action upon the advice of the Literary Agent, if one exists of the 2011 Mockingbird Trust," with respect to the Estate's literary properties. (*Id.* Articles 5, 6). The Will does not disclose the identity of the "Literary Agent of the 2011 Mockingbird Trust" upon whom Carter is instructed to rely (although the literary agent with whom Rudinplay has been dealing on behalf of the Estate is Andrew Nurnberg, in London, UK (Rudin Decl. ¶ 9)), and the 2011 Mockingbird Trust documents have not been publicly disclosed.

### C. Following Harper Lee's Death, Ms. Carter Claims that the Play Departs from the "Spirit" of the Novel, and Files Suit Against Rudinplay in Alabama Federal Court

The Agreement provides that the final Play "shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters." (Agreement ¶ 12). In sharp contrast to Ms. Lee's absolute approval right over the choice of playwright, the Agreement did not grant her any approval right over the script for the Play, or any right to subjectively determine whether the Play "derogates or departs" from the spirit of the Novel, or alters its characters. Rather, the Agreement provided only that Ms. Lee had "the right to review the script of the Play and to make comments which shall be considered in good faith" by the playwright. (*Id.*). The Agreement further provided that, if Ms. Lee nevertheless believed that the Play did so derogate or depart

---

[3] References to "Strauss Decl." are to the Declaration of Jonathan Strauss dated April 16, 2018, submitted herewith.

6

from the spirit of the Novel, or alter characters, she was obligated to "give[] notice [to Rudinplay] as soon as possible," whereupon Rudinplay would have the right—but not the obligation—to meet with Ms. Lee to discuss resolution of her concerns. (*Id.*).

In accordance with these provisions, in August 2017, Rudinplay sent a draft of the script for the Play to the Estate through Andrew Nurnberg, Ms. Lee's London-based literary agent. (Rudin Decl. ¶ 9). Thereafter, in September 2017, Ms. Carter and Mr. Nurnberg conveyed two minor comments, and otherwise did not express any significant concerns. (*Id.* ¶¶ 10-12). Following these communications, Rudinplay continued with preparations for the Play's anticipated December, 2018 premiere and continued to incur significant expenses.

On or around February 13, 2018, Mr. Rudin sent an updated draft script to Mr. Nurnberg and Ms. Carter, which contained some revisions (including to address a minor comment that Ms. Carter had previously raised) but was, in all material respects, substantially similar to the version that Mr. Rudin had previously sent in August 2017. (*Id.* ¶ 13). Three days later, on February 16, 2018, Mr. Rudin met with Ms. Carter and Mr. Nurnberg in New York, New York. During that meeting, Ms. Carter raised purported "objections" to the Play that neither she nor Mr. Nurnberg had ever previously asserted. (*Id.* ¶ 14).

On March 5, 2018—over six and a half months after receiving a substantially complete draft of the Play's script—Ms. Carter sent a letter to Mr. Rudin (the "March 5 Letter") in which she purported to raise, for the first time, a litany of additional objections to the script. Among other things, the March 5 Letter asserted that the script for the Play "altered" the characters of Atticus Finch, Calpurnia, Tom Robinson, Jem Finch and Scout Finch, and somehow "derogated or departed" from the spirit of the Novel in several ways. (*Id.* ¶ 15).

Rudinplay's attorney responded to the March 5 Letter on March 9, 2018 (the "March 9 Letter"). (*Id.* ¶ 16, Ex. C). Among other things, in his response, Rudinplay's attorney noted that Rudinplay did not believe that the then-current draft of the script of the Play either derogated or departed from the spirit of the Novel or altered its characters, but that Rudinplay was "eager to discuss the issues raised ... and to have a dialogue about these issues"—as explained *supra* at 6-7, the Agreement provided that, if Ms. Lee believed that the Play impermissibly departed from the Novel's spirit or altered its characters, Rudinplay would have a right to meet with Ms. Lee to discuss a resolution. The March 9 Letter also observed that there was limited time to make changes to the script given the Play's upcoming final workshops and premiere, and noted that these time pressures had been exacerbated by the Estate's decision to wait approximately six months after receiving the script to raise its purported "objections." (*Id.*).

The Estate did not respond to the March 9 Letter, or agree to meet with Rudinplay to discuss resolution of its purported concerns—as the Estate is required to do under the Agreement. Instead, just two business days later, on March 13, 2018, Ms. Carter, purportedly acting in her capacity as Personal Representative of the Estate, filed a complaint against Rudinplay in the United States District Court for the Southern District of Alabama (the "Alabama Action"), seeking a declaration that the Play impermissibly derogates or departs from the spirit of the Novel in numerous ways, and impermissibly alters its characters. (Strauss Decl. Ex. H pp. 12-15).[4]

---

[4] A few weeks later, Ms. Carter filed an amended complaint in the Alabama Action, which withdraws numerous of the initial complaint's claimed bases for declaratory relief, but continues to seek a declaration that the Play (i) derogates or departs from the spirit of the Novel in connection with its depiction of the legal proceedings against Tom Robinson, and (ii) alters the characters of Atticus and Jem. (Strauss Decl. Ex. I ).

Immediately after the filing of Ms. Carter's amended complaint, Rudinplay filed a motion to dismiss the Alabama Action for lack of personal jurisdiction over Rudinplay pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404. As explained in greater detail in Rudinplay's motion to dismiss (Strauss Decl. Ex. J), the law is clear that the mere act of entering into a contract with an Alabama resident is not sufficient to subject a defendant to personal jurisdiction in that forum, and there is simply no basis for the assertion of personal jurisdiction over Rudinplay in Alabama. Rudinplay has no contacts with Alabama, did not set foot in Alabama or deal directly with anyone in Alabama in negotiating or executing the Agreement at issue, and did not take any action by which it purposefully availed itself of the privilege of conducting activities within Alabama. To the contrary, in negotiating and executing the Agreement, Rudinplay dealt exclusively with Ms. Lee's representatives in New York and London, the Agreement is governed by New York (not Alabama) law, and the performance of the Agreement has occurred almost entirely in New York. (*See generally* Strauss Decl. Ex. J, at 1-18).

### D. **Defendants' False Claims are Preventing Rudinplay from Exercising its Option, and Are Causing Irreparable Harm**

As explained *supra* at 5, pursuant to the Agreement, in order to exercise its Option to acquire live stage rights in and to the Novel, Rudinplay must present an initial commercial first class production of the Play, either on Broadway or in the West End of London, within the Option period.

In order for the Play to premiere as scheduled in December 2018, Rudinplay will need to raise millions of dollars in additional capitalization. However, the existence of the present dispute has rendered it impossible to raise the necessary capitalization, as reliable investors are

not willing to invest millions of dollars when a cloud exists over Rudinplay's rights. (Rudin Decl. ¶ 20). Accordingly, if the present dispute is not resolved in the immediate future, Rudinplay will not be able to raise the necessary capitalization, the cast will be released from its commitments, and the reservation of the theater, and the Play, will be canceled. (Id.).

Rudinplay will suffer irreparable harm that cannot adequately be compensated by money damages if it is forced to cancel the Play before its Broadway premiere, and thus prevented from exercising its Option to acquire live stage rights in the Novel. First, it is difficult, if not impossible, to determine the profits that Rudinplay would lose if it is deprived of the opportunity to stage the Play on Broadway—among other things, this would depend on the degree of success that the Play might achieve, and how long it might run—to say nothing of lost profits resulting from the lost opportunity to stage subsequent first-class productions (including on the West End of London) and touring productions, or from the exploitation of stock and amateur rights and other subsidiary rights. (Id. ¶ 21). Second, even setting aside its lost profits, Rudinplay will suffer immeasurable harm to its reputation if it is forced to cancel the Play at this late date, including its reputation with the talented cast members and director who have committed to participating in the Play, as well as the theater owner and general management company with whom it contracted. (Id. ¶ 22). This reputational harm will damage Rudinplay's future business opportunities in ways that are impossible to quantify.

## ARGUMENT

## I.  RUDINPLAY SHOULD RECEIVE EXPEDITED DISCOVERY

"District Courts have broad power to permit expedited discovery in appropriate cases...." *Benham Jewelry Corp. v. Aron Basha Corp.*, No. 97 Civ. 3841 (RWS), 1997 U.S. Dist. LEXIS 15957, at *58 (S.D.N.Y. Oct. 14, 1997). Courts generally assess requests for expedited discovery under the "flexible standard of reasonableness and good cause" set forth in *Ayyash v.*

*Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (Lynch, J.), which requires that a party seeking leave to engage in expedited discovery establish to the court's satisfaction that the requests are "reasonable under the circumstances." *OMG Fid., Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 303 (N.D.N.Y. 2006); *see also, e.g., Stern v. Crosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007); *Raza v. City of New York*, 998 F. Supp. 2d 70, 75 (E.D.N.Y. 2013).

Here, Rudinplay's request for expedited discovery plainly satisfies the flexible standard of reasonableness and good cause. First, Rudinplay has undoubtedly shown good cause for the limited discovery it seeks, as "there is considerable urgency to [Rudinplay's] need to seek information" that could facilitate a speedy resolution of this matter. *Ayyash*, 233 F.R.D. at 327. As explained *supra* at 9-10, the very existence of the present dispute has rendered it nearly impossible for Rudinplay to raise the necessary capitalization to fund the production of the Play. Unless this dispute is resolved in the very near future, it is likely that the Play will be canceled, depriving Rudinplay of the valuable rights that it contracted and paid for, resulting in irreparable harm in the form of reputational damage and immeasurable lost profits, and depriving the public of an opportunity to view and enjoy an extraordinary work, created by some of the world's most talented creative minds. Expedited discovery may contribute to the speedy resolution of this dispute, thus avoiding these adverse consequences.

Second, the limited, tailored expedited discovery that Rudinplay seeks is eminently "reasonable under the circumstances." *OMG Fid.*, 239 F.R.D. at 303. Rudinplay's requests are not excessive, but rather consist only of ten document requests and four interrogatories (which seek only the identities of relevant witnesses and other individuals) (Strauss Decl. Exs. K, L). Rudinplay also requests the opportunity to take just two depositions—of Ms. Carter and Mr.

Nurnberg (the Estate's literary agent, with whom Rudinplay has dealt extensively). It will thus not be unduly burdensome for Defendants to respond to these requests in an expedited fashion.

The topics addressed in Rudinplay's discovery requests are also narrowly tailored to issues that are at the heart of, and may lead to a speedy resolution of, the present dispute. For example, some of Rudinplay's discovery requests are directed to issue of whether Ms. Carter truly has authority to raise purported "objections" to the Play on the Estate's behalf. (*See* Strauss Decl. Ex. K, Requests 3-8; Ex. L, Interrogatories 1-2). As explained *supra* at 5-6, Ms. Lee's probate file, including her will, was only recently unsealed, but the unsealing of the Will serves to raise numerous additional questions concerning Ms. Carter's authority. The Will was signed only eight days before Ms. Lee's death, and it is unclear whether, and to what extent, the Will differed from any prior document that Ms. Lee had created to distribute her assets. The Will also directed that the bulk of Ms. Lee's assets, including her literary properties, be transferred to a trust (the 2011 Mockingbird Trust), and directed that the "personal representative" of the Will should rely and take action upon the advice of the "Literary Agent, if one exists, of the 2011 Mockingbird Trust" with respect to the Estate's literary properties. The 2011 Mockingbird Trust documents have not been publicly disclosed; nor have the identities of the Literary Agent, or any trustees or beneficiaries of the trust.

Rudinplay is suffering harm as a result of Ms. Carter's actions, ostensibly on behalf of the Estate. Before that harm becomes irreparable, Rudinplay is entitled to understand whether Ms. Carter is truly authorized to take these actions, or whether her exercise of authority is inconsistent with, *inter alia*, the trust documents that govern the exploitation of Ms. Lee's literary properties.

The remaining expedited discovery that Rudinplay seeks is similarly tailored to information relating to the critical question of whether the Play "derogates or departs" from the "spirit" of the Novel or alters its characters (Strauss Decl. Ex. K, Requests 1-2, 9-10; Ex. L, Interrogatories 3-4)—and, relatedly, whether Defendants truly believe that the Play impermissibly departs from the Novel, or whether they are asserting these claims because they wish to force the Play's cancellation for ulterior purposes.[5]

## II.    RUDINPLAY'S DECLARATORY JUDGMENT CLAIMS SHOULD RECEIVE AN EXPEDITED RESOLUTION

For similar reasons, Rudinplay is entitled to expedited resolution of its claims seeking declarations that (i) the Play does not derogate or depart from the spirit of the Novel or alter its characters in violation of the Agreement, and (ii) Ms. Carter lacks authority to assert purported objections to the Play on behalf of the Estate.  (Compl. ¶¶ 70-85).  Speedy disposition of either of these claims in Rudinplay's favor will allow the Play to proceed without further interruption, will avoid the irreparable harm that would otherwise befall Rudinplay, and will ensure the public has an opportunity to enjoy an extraordinary creative work.  Alternatively, expedited disposition in Defendants' favor will have similarly beneficial effects, as it will streamline this action and resolve uncertainty, without prejudicing either party.

Rule 57 of the Federal Rules of Civil Procedure provides that "[t]he court may order a speedy hearing of a declaratory judgment action."  In addition, Rule 42(b) further provides, in relevant part, that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims ...."  This speedy resolution

---

[5] For example, Rudinplay has reason to believe that the true reason that Ms. Carter belatedly raised "objections" to the script is that the Estate is involved in a dispute with a third party or parties concerning ownership of the live stage rights that Ms. Lee assigned to Rudinplay pursuant to the Agreement.  (Rudin Decl. ¶¶ 17-18).  If the Play is canceled, the Estate may avoid potential liability to such third party or parties, or potential indemnification obligations to Rudinplay.

provision "embodies a strong policy favoring early resolution of declaratory judgment actions." *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484, 491 (S.D.N.Y. 2011). Indeed, the speedy hearing provision of Rule 57 "is so sensible and appropriate that there is a dearth of decided cases involving that provision." 10B Charles Alan Wright et al., Fed. Prac. & Proc.: Civ. 4th § 2768, at 646-47 (2016).

Nonetheless, courts have consistently granted expedited consideration where, as here, a plaintiff "has a pressing need ... for a definitive resolution," and "[a]ny unnecessary delay likely would be seriously prejudicial." *Chevron Corp.*, 800 F. Supp. 2d at 491; *see also Rechler P'ship v. Resolution Tr. Corp.*, Civil No. 90-3091, 1990 U.S. Dist. LEXIS 18714, at *17 (D.N.J. Sep. 4, 1990) (granting speedy hearing where "the dramatic and exigent circumstances of plaintiff's situation demand that this Court adjudicate this matter in a prompt and expeditious manner"). There can be no doubt that Rudinplay faces dramatic and exigent circumstances, and that any delay in resolving its declaratory judgment claims will be severely prejudicial. Rudinplay has already incurred significant costs, and expended significant goodwill, in preparing for a first class, Broadway premiere of the Play. If this dispute is not resolved in the very near future, the Play will be canceled, resulting in irreparable harm to both Rudinplay and the viewing public. (*See supra* at 9-10). A subsequent determination by the Court in Rudinplay's favor, finding that the Play did not impermissibly depart from the spirit of the Novel or alter its characters (or that Ms. Carter lacked authority to raise such objections) will be largely meaningless—the harm will have already been done.

By contrast, expedited resolution of Rudinplay's declaratory judgment claims would not prejudice Defendants in any way; if anything, Defendants should wish for a definitive resolution of whether the Play violates the Agreement. *See Chevron Corp.*, 800 F. Supp. 2d at 491-92.

14

Indeed, as explained *supra* at 8, Ms. Carter (ostensibly acting on behalf of the Estate) filed her own declaratory judgment action, raising substantively identical issues to those raised here, just *two business days after* receiving the March 9 Letter—without waiting to discuss resolution of the dispute with Rudinplay, as she was required to do under the Agreement. Having improperly rushed to the Courthouse (in a forum in which personal jurisdiction over Rudinplay is lacking), Ms. Carter and the Estate cannot now purport to object to a prompt resolution of this dispute.

It should be noted that the Agreement defines "the Play" as "a dramatic adaptation of the Novel for presentation as a live stage play." (Agreement¶ 1). Thus, determination of whether or not "the Play … derogate[s] or depart[s] in any manner from the spirit of the Novel []or alter[s] its characters" (Agreement ¶ 12) will require the Court and the jury to actually view the Play, rather than merely read its script. (Among other things, determination of whether the character of Atticus Finch appearing in the Play is true to the Atticus of the Novel will require the Court and the jury to observe an actor's portrayal of this iconic character.)

In order to facilitate expedited resolution of its declaratory judgment claims, Rudinplay is willing to arrange for an immediate performance of the Play, by as much of its full Broadway cast as is possible, to take place in the Courthouse, for the Court and jury's benefit. Rudinplay is confident that, upon seeing the Play, it will be apparent that the Play does not impermissibly depart from the spirit of the Novel or alter its characters in any way, and that Ms. Carter's claims to the contrary are without merit.

## III.     CONFIDENTIAL     INFORMATION     CONCERNING     THE     PLAY,     AN UNPUBLISHED WORK, SHOULD BE FILED UNDER SEAL

Finally, Rudinplay respectfully requests that the Court issue an order requiring that, until further notice, if any documents or materials that reveal substantial or significant plot points

regarding the Play—including any scripts or draft scripts, or the March 5 Letter—are filed in this action, they should be filed under seal.

The Play, of course, has yet to be publicly performed; the script for the Play certainly has not been published. Courts have long recognized that authors should generally have the right to control the first publication of their work, and that early publication without the author's permission may have a deleterious effect on the value of the work:

> The period encompassing the work's initiation, its preparation, and its grooming for public dissemination is a crucial one for any literary endeavor. The Copyright Act, which accords the copyright owner the right to control the first public distribution of his work, echos the common law's concern that the author or copyright owner retain control throughout this critical stage. The obvious benefit to author and public alike of assuring authors the leisure to develop their ideas free of expropriation outweighs any short-term 'news value' to be gained from premature publication of the author's expression. ... The author's control of first public distribution implicates not only his personal interest in creative control but his property interest in exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing.

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 554-55 (1985) (internal quotations and citations omitted). Here, if the entire script for the Play, or significant plot points, are revealed before Rudinplay is prepared to present the Play for public consumption, it could harm the value of the work (Rudin Decl. ¶ 25). Rudinplay is bringing this action to protect its rights in a valuable artistic work; it would be perverse result if, by bringing this action to enforce its rights, Rudinplay is required to assent to the diminishment of the value of such work by allowing it to be publicly filed.

To their credit, Defendants have already recognized that it would be inappropriate to publicly reveal details of the Play in connection with the present litigation. Defendants themselves filed the March 5 Letter *under seal* in the Alabama Action (*see* Strauss Decl. Ex. I ¶ 38), reflecting their recognition that the letter, which quotes extensively from the Play and discusses its plot, should not be publicly disseminated at this time. And the Court in the

Alabama Action expressly approved the filing of the March 5 Letter under seal, noting that it "contains highly detailed descriptions of specific passages from a draft script of a play that has not yet been made public," it "is therefore confidential and proprietary information of Rudinplay," and that "[p]ublic disclosure ... at this time would likely cause significant harm to [Rudinplay]." (Strauss Decl. Ex. M at 1-2). Accordingly, the Court found that "the private interest in nondisclosure of [the March 5 Letter] outweighs and overcomes the presumption in favor of public access." (*Id.* at 2).

For the same reasons that the Court in the Alabama Action held that the March 5 Letter should be filed under seal, that letter, along with any draft scripts or other materials that reveal details of the Play, should be filed under seal here. While there is a presumption of public access to judicial documents, "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). "[W]here documents are used to determine litigants' substantive legal rights, a strong presumption of access attaches." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006) (quotation omitted). However, "[w]hen a court evaluates submissions and renders a decision that does not meaningfully affect the parties' substantive rights the public interest in access is not as pressing." *Carter v. City of New York*, 14-CV-4236 (VEC), 2016 U.S. Dist. LEXIS 75783, at *11-12 (S.D.N.Y. June 9, 2016) (quoting *Amodeo*, 71 F.3d at 1049)) (internal quotations omitted).

Here, the action is at its earliest stages. By this motion, Rudinplay is not asking the Court to review the scripts to determine the Play's faithfulness to the Novel, to determine the accuracy of the assertions contained in the March 5 Letter, or otherwise to determine the parties'

substantive legal rights; it is merely asking the Court to set an expedited schedule for discovery and determination of certain claims. Thus, there is no significant right of access at issue that would warrant public disclosure of confidential information concerning the details of the Play's plot. *See Carter*, 2016 U.S. Dist. LEXIS 75783, at *11 (no First Amendment right of access where motion at issue "related to the Court's administration and management of the case" and "did not relate to the parties' substantive legal rights").[6] Thus, at this early stage of the proceedings, it is appropriate to require that the confidential script for the Play, and any other materials revealing significant or substantial plot points, be filed under seal to protect the value of this unpublished work.

## CONCLUSION

For the foregoing reasons, Rudinplay respectfully requests that its motion for orders granting Rudinplay limited expedited discovery, granting expedited resolution of Rudinplay's declaratory judgment claims, and ordering that certain confidential information be filed under seal, be granted.

---

[6] Even if there were a significant First Amendment right of access at issue, the First Amendment does not trump an author's right to control the initial publication of his work. *Cf. Harper & Row*, 471 U.S. at 555-60.

Dated: New York, New York
April 17, 2018

LOEB & LOEB LLP

By: /s Jonathan Strauss

Jonathan Zavin
Jonathan Neil Strauss
Sarah Schacter
Sara Slavin
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Plaintiff*

16213697
227691-10003